**KHALID BIN ALWALEED FOUNDATION, a Trust under the laws of Liechtenstein, Plaintiff,**

**v.**

**E.F. HUTTON & COMPANY, INC., E.F. Hutton & Company (Securities), Ltd., Sharif Serageldin and Sami Beydoun, Defendants.**

No. 88 C 5074.

United States District Court, N.D. Illinois.

March 13, 1989.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

This cause comes before the court on the motion of defendants to dismiss Counts 1 through 12. For the reasons herein stated, the motion is granted.

### FACTS

In June of 1988 plaintiff, Khalid Bin Alwaleed Foundation ("Foundation"), filed suit against defendants seeking $21,959,000 in compensatory damages for alleged violation of Sections 4b and 4o of the Commodity Exchange Act ("CEA"), 7 U.S.C.A. §§ 6b, 6o (West 1980) and Rules 1.55 and 166.3 of the Commodity Futures Trading Commission ("CFTC" or "Commission"), 17 C.F.R. §§ 1.55, 166.3. The Foundation also asserts pendent state claims of fraudulent concealment, fraudulent misrepresentation, constructive fraud, negligence, negligent misrepresentation, breach of contract and civil conspiracy, seeking $21,959,000 in actual damages and $50,000,000 in punitive damages. The Foundation also seeks rescission of its contract with defendant E.F. Hutton & Company, Ltd.

### DISCUSSION

#### I. Capacity to Sue

■ In its complaint the Foundation states that it is a "trust organized under the laws of the Principality of Liechtenstein" (cmplt., ¶ 4). Under Illinois law a trust cannot sue on its own behalf; instead the trustee is statutorily empowered to "compromise, contest, prosecute or abandon claims or other charges in favor of or against the trust estate." Ill.Rev.Stat., ch. 17, ¶ 1665 (1981). Defendants argue that because under Fed.R.Civ.P. 17(b) the court is obliged to determine capacity to sue by the law of the state in which the district court is held (except in the case of certain individuals, corporations, partnerships and receivers) the court should apply Illinois law and find that the Foundation as a "trust" lacks the capacity to sue.

Plaintiff replies that the Foundation, although created by a deed of trust, is actually a corporate form of association under Liechtenstein law. Under Fed.R.Civ.P. 17(b) the capacity to sue a corporation is determined by the law of the state under which it was organized. Plaintiff argues that because under Liechtenstein law a foundation, as a corporate entity, can sue and be sued the court should accord it the same right. It is true, as defendants contend, that the Foundation differs in several respects from a corporation as commonly defined in this country. Nevertheless, because the Foundation is a juridical entity under the laws where it was created, there is no reason to deny it access to the federal courts. Compare *Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance et D'Armement*, 451 F.2d 727 (2nd Cir.1971) (because corporations had capacity to sue where they were incorporated—France and Switzerland, respectively—they had capacity to sue in federal courts for purposes of Rule 17(b), despite Franco–Swiss treaty requiring suit to be brought in France), *with Alosio v. Iranian Shipping Lines, S.A.*, 426 F.Supp. 687 (S.D.N.Y.1976), *aff'd*, 573 F.2d 1287 (2nd Cir.1977) (where corporation is dissolved under Iranian law it lacks capacity to sue in federal court).

#### II. Counts 1 and 2

##### A. Churning

■ Defendants contend that plaintiff has failed to adequately allege its claims in Counts 1 and 2 that defendants are liable for excessive churning in violation of Sections 4b and 4o of the CEA, 7 U.S.C. §§ 6b, 6o (West Supp.1988) (cmplt., ¶¶ 32, 43, 47(C)). The court agrees. The CFTC has defined churning as the excessive trading

of an account by a broker with control of the account for the purpose of generating commissions without regard for the investment or trading objectives of the customer. *In re Lincolnwood Commodities, Inc. of Calif.*, (1982–84 Transfer Binder) Comm. Fut.L.Rep. (CCH) ¶ 21,986 at p.28,246 (CFTC 1984). Thus to state a claim for churning a customer must allege excessive trading and excessive billing. *Proetz v. Dean Witter Reynolds, Inc.*, 2 Comm.Fut. L.Rep. (CCH) ¶ 24,178 at p.34,915 (N.D.Ill. 1988). In order to establish excessive trading courts have generally held that the plaintiff must identify the commodity involved, the nature, amounts and dates of transactions at issue, as well as sufficient facts to allow for a determination of either the turnover ratio or the commission-to-equity ratio in the account. *Proetz* at p.34,-915 (citing *Bieganek v. Wilson*, 642 F.Supp. 768, 771 (N.D.Ill.), *vacated in part*, 801 F.2d 879 (7th Cir.1986)); *Shelley v. Noffsinger*, 511 F.Supp. 687, 692 (N.D.Ill. 1981). Because churning is a species of fraud these allegations must be made with specificity. Fed.R.Civ.P. 9(b).

■ Plaintiff contends that these ratios are not useful criteria of churning and that the court ought to consider other factors such as the trader's rationale and the goals of the investor. While we note that the CFTC has stated that the turnover ratio "as applied in securities churning cases, [is] inherently inappropriate in determining whether excessive trading has been established in futures churning cases," *Lincolnwood Commodities* at p.28,247, it has also expressly endorsed the commission-to-equity ratio for this purpose, stating

> "[T]he amount of commissions directly reflects the volume of trades entered and liquidated in the market over a given period of time, which is *highly relevant* in determining whether trading was conducted merely to earn commissions for the broker."

*Id.* at p.28,248 (emphasis added). Plaintiff fails to allege sufficient facts to determine either of these ratios. While it is true that

evidence of both day-trading and a departure from a previously agreed-upon trading strategy can be probative of churning, *id.* at p.28,250; *Proetz* at p.34,915, the facts that plaintiff has alleged in these regards are not sufficient to state a claim. *See cmplt.* at ¶¶ 43, 47. Thus to the extent that Counts 1 and 2 of the complaint attempt to state a claim for churning, they are dismissed.

### B. Statutory Fraud

Defendants argue that because plaintiff's fraud claims do not give each defendant notice of the particular wrongs with which he is charged these claims violate Rule 9(b). The court agrees. For example, plaintiff alleges "defendants, and each of them, cheated, defrauded and attempted to cheat and defraud the Foundation by making material misrepresentations to the Foundation, including ..." (cmplt., ¶ 48). It is unclear from this language *how* the corporate defendants are alleged to have made these representations. While it is possible to construe the complaint as implying that the corporate defendants committed these and the other alleged fraudulent acts *only* through their co-defendant employees, the pleading is sufficiently general as to admit other explanations. Consequently, the corporate defendants are left without any understanding of the specific frauds alleged against them and thereby have no means of offering a cogent defense. Thus insofar as Counts 1 and 2 attempt to state a cause of action for fraud other than churning under Sections 4b and 4o, they are dismissed. If plaintiff seeks to file an amended complaint it should refrain from making generalized allegations of fraud such as it made against "defendants, and each of them," and instead explicitly state with respect to each claim the specific alleged culpable conduct of each defendant and the theory of recovery sought.

### III. Counts 3 and 4

■ In Count 3 of the complaint plaintiff alleges that defendants violated rule 166.3 [1]

---

1. Rule 166.3 states:

> "Each Commission registrant, except an associated person who has no supervisory duties,

of the CFTC, 17 C.F.R. § 166.3, which directs all commission registrants to diligently supervise their employees' handling of commodity interest accounts. In Count 4 plaintiff alleges that defendants violated Rule 1.55 [2], 17 C.F.R. § 1.55, which requires futures commission merchants to provide Public Disclosure Statements to customers upon opening a commodity trading account. Defendants contend that Rules 1.55 and 166.3 do not give rise to a private cause of action and therefore should be dismissed. The court agrees.

The Supreme Court has stated that "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chgo.*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the court set forth several factors that are relevant to the determination of whether a private remedy is implicit in a statute not expressly providing one:

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,'—that is does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"

*Id.* at 78, 95 S.Ct. at 2088 (emphasis in original) (citations omitted). Subsequently, in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the court explained the proper application of the *Cort* factors:

"It is true that in *Cort v. Ash*, the court set forth four factors it considered 'relevant' in determining whether a private remedy is implicit in a statute not expressly providing one. But the court did not decide that each of these factors is entitled to equal weight. *The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action.* Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose,—are ones traditionally relied upon in determining legislative intent."

*Id.*, 442 U.S. at 575–76, 99 S.Ct. at 2489 (emphasis added) (citations omitted).

A review of the language of the statute that authorized these regulations, its focus and legislative history, indicates that Congress did not intend that the rules promulgated by the CFTC should give rise to a private cause of action. This statute, the CEA, 7 U.S.C.A. §§ 1–26 (West 1980 & Supp 1988), had its genesis in 1922 when Congress passed the Grain Futures Act, 42 Stat.998 (1922), to regulate grain exchanges. *See* S.Rep. No. 1131, 93rd Cong. 2d Sess., *reprinted in* 1974 Code Cong. & Admin. News, 5843, 5855. In 1936 Congress amended the legislation renaming it the Commodity Exchange Act, 49 Stat.

---

must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts covered, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant."

17 C.F.R. § 166.3.

2. Rule 1.55 states in pertinent part:
   "(a) No futures commission merchant or, in the case of an introduced account, no introducing broker may open a commodity futures account for a customer unless the futures commission merchant or introducing broker first: (1) Furnishes the customer with a separate written disclosure statement contriving only the language set forth in paragraph (b) of this section (except for nonsubstantive additions such as captions); and (2) receives from the customer an acknowledgment signed and dated by the customer that he received and understood the disclosure statement."

17 C.F.R. § 1.55.

1491 (1936), and expanding its regulatory reach to include commodities other than grains and abuses by exchange members. *Id.* In 1968 Congress again amended the CEA, 82 Stat. 26 (1968), to, *inter alia,* broaden the range of commodities covered, set minimum financial standards for futures traders and increase the penalties for violations. *Id.* In 1974 Congress substantially revised the CEA by passing the Commodity Future Trading Commission Act of 1974, 88 Stat.1389 (1974), which, *inter alia:*

> "[C]reated the Commodity Futures Trading Commission as an independent agency to administer the Commodity Exchange Act and granted the Commission exclusive jurisdiction over transactions involving future contracts and certain other commodity—related activities."

S.Rep. No. 85, 95th Cong.2d Sess. *reprinted in* 1978 U.S.Code Cong. & Admin.News 2098. Specifically the CEA, as amended in 1974, stated that "the Commission is authorized to promulgate such rules and regulations as it deems necessary to govern the operating procedures and conduct the business of the Commission." Public Law 93–463 § 101(a)(11), 88 Stat. 1389 (1974), *codified at* 7 U.S.C.A. § 4a(j) (West 1980). Pursuant to this authority the Commission adopted Rules 166.3 and 1.55. 43 Fed.Reg. 31886 (1978).

The 1974 amendments also provided that anyone complaining of a violation of "this chapter or any rule, regulation or order thereunder ... may" seek relief by going through the CFTC's reparations procedure. Public Law 93–463 § 106(a), 88 Stat. 1389 (1974), *codified at* 7 U.S.C.A. § 18 (West 1980). Given Congress' use of the permissive "may," courts from 1974 to 1982 were split on whether a person injured as a result of a violation of the CEA itself could pursue private litigation. *Compare Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman,* 593 F.2d 129, 133 n. 7 (8th Cir.), *cert. denied,* 444 U.S. 838, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979) (investor may maintain an action against his broker for violations of anti-fraud provisions of the CEA) (dictum) *with Rivers v. Rosenthal & Co.,* 634 F.2d 774 (5th Cir.1980), *vacated,* 456 U.S. 968, 102 S.Ct. 2228, 72 L.Ed.2d 841

(1982) (no private right of action available). While Congress considered proposals to resolve this conflict, the Supreme Court granted certiorari on the issue. *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

Two weeks after the court decided in *Curran* that Congress did imply a private cause of action for violations of the CEA itself, the Agricultural Committee of the House of Representatives filed its report on the then-proposed 1982 CEA amendments, stating:

> "At the time the Committee considered the bill, the Supreme Court had not yet resolved the issue of whether a private right of action could be implied under the *Act.* The Committee is of the view that the right of an aggrieved person to sue a violator of the *Act* is critical to protecting the public and fundamental to overtaking the credibility of the future markets."

H.R.Rep. No. 565, 97th Cong.2d Sess. pt.1 at 56–57, *reprinted in* 1982 U.S.Code Cong. & Admin.News, 3871, 3905–06 (emphasis added). Thus while the Committee determined that the availability of private rights of action for violation of the CEA were "critical" and "fundamental" it was silent on whether such actions should be available for violations of *rules* issued pursuant to the CEA. The Committee plainly stated however that it intended the availability of a private action to supplement, "not substitute, for the regulatory program of the CFTC ...," and that it expected the CFTC to "vigorously use the tools at its command to protect the investing public so that it does not become necessary to rely on private litigants as a policeman" of the CEA. H.R.Rep. No. 565, 97th Cong.2d Sess. pt.1 at 57, *reprinted in* 1982 U.S. Code Cong. & Admin.News 3906. These passages indicate that Congress intended the private right of action to be a necessary exception to the general rule of CFTC enforcement and as such to be limited to its terms, i.e., for violations of the CEA itself. Plaintiff fails to direct the court to other

portions of the legislative history that contradict this interpretation.

An examination of the language and focus of the statute as amended in 1982 reinforces this view. Notably, instead of making private actions available to persons injured by violations of "this chapter, *or any rule, regulation or order thereunder*" as it had for the reparations procedure, 7 U.S.C.A. § 18(a) (West 1980) (emphasis added), Congress made private lawsuits available only against violators of "this chapter" and anyone who "aids, abets, counsels, induces, or procures the commission of such a violation," 7 U.S.C.A. § 25 (West Supp.1988)—i.e., no mention was made of providing a private lawsuit as a remedy for violations of "rules, regulations, or order[s]" promulgated pursuant to the CEA. "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mtge. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979). Thus the "language and focus" of the CEA, *Touche Ross*, 442 U.S. at 576, 99 S.Ct. at 2489, indicates that Congress did not intend to imply a private cause of action for violations of rules and regulations that the CFTC promulgates.

Plaintiff's contention that a private cause of action for violation of CFTC rules existed at the time Congress amended the CEA, as set forth in the following cases, is not well founded. *See CFTC v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); *Irvine v. Cargill Investor Services, Inc.*, 799 F.2d 1461 (11th Cir.1986); *Sturken v. Clayton Beverage Co. of St. Louis*, [1982–84 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 21,727 at p. 26,863, *aff'd sub nom.*, *Clayton Brokerage Co. v. CFTC*, 794 F.2d 573 (11th Cir.1986); *Woods v. Reno Commodities, Inc.*, 600 F.Supp. 574 (D.Nev.1984). *Schor* held that the CFTC had jurisdiction to hear state law counterclaims in reparations proceedings. 106 S.Ct. at 3255. The *Irvine* court stated *in dicta* that it "believe[d]" that there "proba-

bly" was such a cause of action and that "even if not, the jury should have received instructions on the violations as negligence per se or evidence of negligence." 799 F.2d at 1462 n. 3 *Sturken* was a reparations case and *Woods* involved violations of the CEA itself. Thus these cases do not require a contrary interpretation.[3]

Plaintiff also argues that by enacting Rules 1.55 and 1.63 the Commission intended to provide consumers greater protection, 43 Fed.Reg. 31886 (1978), *reprinted in* [1977–80 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 20,642, p. 22,620, and that this is somehow probative on the question of whether a violation of these rules gives rise to a private cause of action. While the rules themselves may shed light on the *Commission's* intent, it is *Congressional* intent that is dispositive on whether plaintiff may state a private claim. *Touche Ross*, 442 U.S. at 576, 99 S.Ct. at 2489. While the court is mindful that it must proceed cautiously when relying upon legislative history to divine the intent of Congress, *Piper v. Chris–Craft Industries*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977), the aforementioned review of CEA history, language and structure persuades the court that Congress did not intend private rights of action for violations of CFTC rules. At least one other court is in agreement that Congress intended no private right of action to exist under Rule 166.3, *Fustok v. Conticommodity Services, Inc.*, 618 F.Supp. 1069, 1074 (S.D.N.Y. 1985), and the CFTC has indicated a similar view towards Rule 1.55. *Abeyta v. Bear Stearns & Co.*, [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,350 at p.25,661 (Feb. 10, 1982) (Rule 1.55 does not give rise to a private cause of action but Section 14(a) of the CEA empowers private parties to institute administrative proceedings before the CFTC for injuries suffered as a result of violations thereunder).

Plaintiff's assertion that its status as a foreign national precludes it from utilizing

---

**3.** *Accord Bennett v. E.F. Hutton Co., Inc.*, 597 F.Supp. 1547, 1555 (N.D.Ohio 1984) ("In *Curran*, the court found that, in amending the CEA in 1974, Congress intended to preserve a pre-exist-

ing private right of action under certain CEA provisions. No such history accompanies § 166.3.")

the reparations procedure is simply unfounded. *See, e.g., Trust & Investment Ab v. Stotler & Co.,* Comm.Fut.L.Rep. (CCH) ¶ 23,928, p. 34,260 (CFTC 1987) (Swiss corporation brought an action before the CFTC). Accordingly, the court grants defendants' motion to dismiss Counts 3 and 4.

Because plaintiff's federal claims in Counts 1 through 4 have been dismissed, the court declines to exercise pendent jurisdiction over plaintiff's state claims in Counts 5 through 12. *See Blau Plumbing, Inc. v. S.O.S. Fix–It,* 781 F.2d 604, 611 (7th Cir.1986) (where federal claim is dismissed before trial, court should relinquish jurisdiction of any pendent state law claim). Accordingly, Counts 5 through 12 are dismissed.

## CONCLUSION

Accordingly, Counts 1 through 12 of defendants' motion to dismiss is granted. Plaintiff is granted leave to file an amended complaint within twenty-eight days.

IT IS SO ORDERED.